J-A27039-23

2024 PA Super 153

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL DAVID SMITH | : | |
| | : | |
| Appellant | : | No. 593 MDA 2023 |

Appeal from the Judgment of Sentence Entered December 7, 2022
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0007244-2019

BEFORE: LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

DISSENTING OPINION BY LAZARUS, J.: **FILED JULY 23, 2024**

I respectfully dissent. In my view, 75 Pa.C.S.A. §§ 3802(d)(1)(i) and (iii) are unconstitutional because the two subsections (1) violate the constitutional right to equal protection and (2) create an irrebuttable presumption in violation of the right to procedural due process. As such, I dissent from the Majority's conclusion that 75 Pa.C.S.A. §§ 3802(d)(1)(i) and (iii) pass constitutional muster.

First, I respectfully disagree with the Majority's analysis of Smith's equal protection argument. Specifically, I would hold that, in light of the uncontroverted expert testimony adduced at trial, like persons (with the same qualifying conditions, prescribed chemically identical medications, which cause similar effects) are treated dissimilarly (based on the schedule classification

_____

[*] Former Justice specially assigned to the Superior Court.

of the prescribed medication), and there is no fair reason for establishing this classification for differentiation of treatment on that basis when considering the object of the DUI statute (road safety). Accordingly, I would find that both Smith's facial and as-applied equal protection challenges to the DUI statute have merit.

Smith argues that the DUI statute violates equal protection principles where it treats similarly situated individuals differently, based on the classification schedule of the individual's prescribed medication—specifically, prescription medical marijuana is a Schedule I drug and prescription Marinol[1] is a Schedule III medication. Smith reasons that the DUI statute is unconstitutional because medical marijuana patients are guilty of a DUI if they drive with any amount of active or inactive metabolites in their blood, *see* 75 Pa.C.S.A. §§ 3802(d)(1)(i), (iii), whereas the Commonwealth must specifically prove Marinol patients are incapable of safely driving, despite any amount of detectable active metabolites in their blood. *See id.* at § 3802(d)(2). There is no similar requirement of proof for medical marijuana patients—i.e., a requirement that the Commonwealth show that medical marijuana patients are incapable of safe driving—even if there is only one detectable **inactive** metabolite in that patient's blood. *See id.* at §§ 3802(d)(1)(i), (iii).

---

[1] I note that Marinol is a brand name that Smith's experts used in their expert opinion testimony, summarized *infra*. The generic name is dronabinol. *See* www.webmd.com/drugs/2/drug-9308/marinol-oral/details (last visited 05/23/24).

Smith points to the uncontested expert testimony adduced at trial, which establishes that medical marijuana and Marinol patients have the same symptoms,[2] that medical marijuana and Marinol are the same chemical

---

[2] David Gordon, M.D., an expert qualified in addiction medicine and medical marijuana, testified on direct examination as follows:

Q. []  What is the active ingredient in marijuana which treats these conditions which has the beneficial effect?

A. It's the Delta-9 tetrahydrocannabinol [(THC)].  That is the active ingredient. []

* * *

Q.  And have you prescribed Marinol with its THC to patients?

A.  I have.  . . .  I still prescribe it in my practice.  Surprisingly, there are instances where that drug works better than even the medical cannabis or is better tolerated.  We could get into specifics, but it's still a drug that I am actively—or I'm still prescribing.

Q.  And Marinol, I believe, is a schedule III drug, correct?

A.  It is.

Q.  **Why doesn't everyone just use Marinol then instead of medical marijuana if they both have the same THC?**

A.  **Well, they could.**  Again, it's very costly.  The pharmaceutical industry has cornered this particular market.  . . .  **Anybody that would have a similar qualifying condition has access**, but, again, it's very costly for a week or a month's supply.  . . .  [Y]ou want to talk about what I consider one of the greatest scientific feats known to mankind that no one knows about is that **the THC in the Marinol is indistinguishable from the THC in the plant**.  Now, we call it synthetic because it's generated in a laboratory, but I've never known a situation where [] a drug[] could[, in a] Petri dish[, be] create[d—]**the same biologic**

*(Footnote Continued Next Page)*

- 3 -

medication, which provide the same effects for patients,[3] and patients of either medication are capable of safely driving with non-zero levels of active metabolites of either medical marijuana or Marinol in their blood.[4]  *See* N.T.

_____

**configuration or biochemical configuration**, if you will[—] and that's what Marinol is. []

N.T. Jury Trial, 7/13/22, at 23-27 (emphasis added).

[3] Jolene Bierly, M.D., an expert qualified in forensic toxicology, testified on cross examination as follows:

Q.  [] [T]he **Delta-9 THC is also the active component of the prescription medication Marinol, correct?**

A. **That's correct.**

Q. And Marinol, that's not marijuana.  It's something different, right?

A. It's prescription marijuana.

* * *

Q. [] **[T]he THC that's in Marinol would have the same effect as the THC in marijuana, right?**

A. **It would be Delta-9 THC in the blood, so it would have the same effects because it is Delta-9 THC in the blood.**

Q. **And [they are] the same potential symptoms [for Marinol, as they are] for just regular marijuana, correct?**

A. **That's correct.**

N.T. Jury Trial, 7/12/22, at 124-26 (emphasis added).

[4] Lawrence Guzzardi, M.D., an expert qualified in medical toxicology, general medicine, and emergency medicine, testified on direct examination as follows:

Q. [] And so, in fact, those studies that are generally accepted show a lack of correlation between THC levels [and] impairment

*(Footnote Continued Next Page)*

because you have to account for things such as tolerance and usage and all of those factors and age, correct?

A. Correct.

Q. And regardless of whether the THC—and I know in terms of your career and experience you've treated patients for various things and you're familiar with other medications that have THC in them[—w]ould the THC, because it's in marijuana, is that something special that the effect of THC in marijuana would be greater than the THC in another drug that could be prescribed?

A. No. So[,] for cancer patients, there is—before medical marijuana came, it was widely used, and, also, for individuals who were going to be driving, we can prescribe a medicine called Marinol, and Marinol basically contains Delta-9 THC, the same thing they're smoking. And that's not a Class 1 drug. That's a Class 3 drug, which means any doctor can prescribe it. Class 1, no doctor can prescribe it. Class 2, you need a special license. Class 3, any doctor licensed can prescribe it. **So[,] Marinol— so[,] if I wanted to get to the same level of Delta-9 THC in you as in Mr. Smith, if I prescribe Marinol to you and you had a Delta-9 THC level of 10, you could safely drive in the Commonwealth of Pennsylvania and legally drive.** An individual who has medical marijuana has the same level, but because it was prescribed in a different form, it[] *per se* could be considered by Pennsylvania law as somebody who's unfit to drive a motor vehicle. **The same medication, the same level, the same drug. Marinol is, quote, legal. Medical marijuana currently is not legal.**

Q. So[,] the bottom line is, and that's not the case here, but **if Mr. Smith had used Marinol and got these blood results, you would look for the same signs or symptoms of impairment or incapable of safe driving** like in the video to see if he was impaired by the Marinol as you would for the medical marijuana?

A. **Correct. And we would look at the level in his blood and say, 10 nanograms, well, you can't use that. Studies have shown that that level doesn't tell you anything about impairment to drive a motor vehicle.** And so you have to say, well, let's look at him. Let's look at his driving. Let's look at how

*(Footnote Continued Next Page)*

- 5 -

Jury Trial, 7/13/22, at 23-27; N.T. Jury Trial, 7/12/22, at 124-26; N.T. Jury Trial, 7/12/22-7/13/22, at 100-03. Smith reasons that this uncontroverted expert testimony requires that we find the DUI statute violates his equal protection rights. I agree.

As a threshold issue, the Majority is correct that strict scrutiny does not apply to Smith's constitutional challenges. *See Commonwealth v. Shawver*, 18 A.3d 1190, 1194-95 (Pa. Super. 2011) (courts generally apply rational basis analysis to equal protection challenges to criminal statutes creating different categories among criminal offenders, and classifications created under DUI statute historically do not implicate fundamental rights or suspect or sensitive classes). Nevertheless, I agree with Smith that the DUI statute violates his equal protection rights, facially and as-applied, under a rational basis analysis.

Indeed, Smith established at trial that medical marijuana and Marinol patients have the same symptoms, that medical marijuana and Marinol are

_____

he did. And then if you saw that he had taken Marinol and that he was driving in an S pattern or following too closely, those are signs of potential impairment by marijuana, and then somebody would have to make a determination whether he was impaired or not, like today's hearing.

Q. **And then for [] Marinol, when that metabolized into active or inactive metabolites, are they the same as on this lab report for the medical marijuana?**

A. **Yes.**

N.T. Jury Trial, 7/12/22 and 7/13/22, at 100-03 (emphasis added).

- 6 -

chemically indistinct, both provide the same effects for patients, metabolize the same way, and patients of either medication are capable of safely driving with non-zero levels of metabolites in their blood.[5]  As such, like persons are treated dissimilarly under the DUI statute, based merely on the schedule of the prescribed medication, which classification fails to bear any reasonable relation to the object of the DUI legislation, road safety.  **See Commonwealth v. Bonadio**, 415 A.2d 47, 51-52 (Pa. 1980) (finding violation of equal protection under rational basis scrutiny where moral legislative classification bears no relation to object of legislation).  Under these circumstances, considering the uncontroverted expert testimony evidencing the lack of differences between prescription medical marijuana and prescription Marinol, and the similar effects of those prescribed medications on patients, there is no justification for the classification of schedules in the DUI statute leading to such disparate treatment, and I would find there is no reasonable or fair and substantial connection between that classification and the object of the legislation.  Further, in light of the above-mentioned uncontested expert testimony adduced at Smith's trial, even if, *arguendo*, not a successful facial challenge, Smith's as-applied constitutional challenge to the DUI statute merits relief.

---

[5] This Court has noted on prior occasions that marijuana is a fat-soluble drug that can stay metabolized in the blood months after its consumption.  **See Commonwealth v. Williamson**, 962 A.2d 1200, 1205 (Pa. Super. 2008) (citing **Commonwealth v. Etchison**, 916 A.2d 1169 (Pa. Super. 2007)).

Also, contrary to the Majority's conclusion, I would find our decision in **Commonwealth v. Dabney**, 274 A.3d 1283 (Pa. Super. 2022), inapposite because it only addressed the question of whether medical marijuana was a Schedule I substance. **Id.** at 1291-92. Smith does not raise this same challenge. Indeed, **Dabney**'s holding need not be disturbed to address Smith's equal protection argument, especially where Smith's claim necessarily is founded on the fact that prescription medical marijuana **is** classified as a Schedule I substance.

Similarly, the Commonwealth's reliance on our decisions in **Commonwealth v. Jezzi**, 208 A.3d 1105 (Pa. Super. 2019), and **Commonwealth v. Waddell**, 61 A.3d 196 (Pa. Super. 2012), fare no better where those appellants similarly challenged marijuana's classification as a Schedule I substance. **Jezzi**, 208 A.3d at 1109; **Waddell**, 61 A.3d at 201-02. Here, again, Smith does not challenge that medical marijuana is a Schedule I substance. Further, contrary to the Commonwealth's claims, it is of no moment when either the Medical Marijuana Act (MMA)[6] or Controlled Substance, Drug, Device, and Cosmetic Act (CSA)[7] was enacted, as this analysis does not rely on intervening law or changes in precedent. Indeed, this Court need not examine whether the MMA superseded the CSA to address Smith's equal protection claims relating to the DUI statute at issue here.

_____

[6] 35 P.S. §§ 10231.101-10231.2110.

[7] 35 P.S. §§ 780.101-780.144.

Next, contrary to the Commonwealth's argument, our prior holding in *Etchison*, *supra*, is inapposite. Although our *Etchison* decision addressed an equal protection challenge, the appellant failed to identify any legislative classification in his appeal because he only argued, **baldly**, that the DUI statute fails rational basis scrutiny since it allows for the prosecution of a non-impaired driver. *Id.* at 1173. Conversely, here, Smith has specifically identified the legislative classification he seeks to challenge within the DUI statute—treatment of Schedule I medical marijuana patients, *see* 75 Pa.C.S.A. §§ 3802(d)(1)(i), (iii), as compared with treatment of Schedule III Marinol patients. *See id.* at § 3802(d)(2).

For the above reasons, I respectfully dissent regarding the Majority's analysis of Smith's equal protection claims.

I also respectfully disagree with the Majority's analysis of Smith's irrebuttable presumption argument. In particular, I would hold that sections 3802(d)(1)(i) and (iii) create unconstitutional irrebuttable presumptions of impairment. Additionally, I would find that such an irrebuttable presumption further deprives lawful prescription medical marijuana patients of a meaningful hearing at which they may present evidence to retain their driver's license.

Preliminarily, I agree with the Majority that driving is not a fundamental constitutional right, but a privilege. *See* Majority, ---DATE---, at 12 (citing

*Commonwealth v. Frederick*, 237 A.3d 1038 (Pa. Super. 2020));[8] *see also*

*Commonwealth v. Bell*, 167 A.3d 744, 747 (Pa. Super. 2017).   However,

privileges may still be unconstitutionally infringed upon by government action.

*See Com. Dept. of Transp. Bureau of Driver Licensing v. Clayton*, 684

A.2d 1060, 1060-61 (Pa. 1996) (law providing for suspension of licensee's

operating privilege based upon epileptic seizures, without giving licensee

opportunity to present medical evidence to establish his or her competency to

drive, created irrebuttable presumption in violation of due process).

Smith argues that sections 3802(d)(1)(i) and (iii) violate his procedural

due process rights because they create irrebuttable presumptions of guilt for

patients who use prescribed medical marijuana lawfully.  Smith contends that

the irrebuttable presumption is that patients lawfully taking prescribed

medical marijuana are unable to drive safely when they have any amount of

marijuana metabolite, active or inactive, in their blood.  Smith asserts that

the statute requires no evidence of impairment in order to sustain a conviction.

Smith points out that sections 3802(d)(1)(i) and (iii) are in contrast to the

DUI statute subsection 3802(d)(2), which is applicable to patients taking

prescribed Schedule II/III drugs, which requires the Commonwealth to prove

impairment beyond mere presence of the drug in a patient's blood.

---

[8] I note that *Frederick* is an unpublished decision from this Court, but may, nevertheless, be cited for its persuasive value.   *See* Pa.R.A.P. 126(b) (unpublished non-precedential decisions of Superior Court filed after May 1, 2019, may be cited for persuasive value).

Smith further argues, as happened here, that expert testimony regarding the impact of marijuana metabolites on a medical marijuana patient's ability to drive should be relevant in refuting a DUI conviction. But, under sections 3802(d)(1)(i) and (iii), an irrebuttable presumption exists where a lawful prescription medical marijuana patient is entirely unable to refute the statute because they will have metabolites in their blood **for months**, even after ceasing use of medical marijuana. Smith argues that this presumption is not universally true and reasonable alternative means of ascertaining the presumed fact are available. I agree.

The irrebuttable presumption doctrine has its roots in a 1970's line of United States Supreme Court decisions. *See Bell v. Burson*, 402 U.S. 535 (1971) (striking down Georgia statute permitting state to revoke driver's license following accident without a fault hearing where driver failed to post security); *Stanley v. Illinois*, 405 U.S. 645 (1972) (striking down Illinois statute which conclusively presumed all unmarried fathers to be unfit parents); *Vlandis v. Kline*, 412 U.S. 441 (1973) (striking down Connecticut statute which conclusively fixed student's residence status at time of application for school admission); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974) (striking school regulations which required pregnant teachers to take leave without pay beginning five months before expected birth of child). Each of these cases created an irrebuttable presumption as a means of achieving an end result found desirable by the legislature. *See Clayton*, 684 A.2d at 1063. Additionally, in each case, the

Court struck down the statute involved "on the basis that the presumptions created were not universally true and did not grant an individual an opportunity to rebut the presumption." *See id.*

In *Bell*, the United States Supreme Court stated:

> Once licenses are issued, as in petitioner's case, their continued possession may become **essential in the pursuit of livelihood**. **Suspension of issued licenses thus involves state action that adjudicates important interests of licensees**. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether that entitlement is denominated a "right" or a "privilege."

*Bell*, 402 U.S. at 539 (emphasis added, citations omitted).

Our Supreme Court has previously stated that "[w]hile procedural due process is a flexible notion which calls for such protections as demanded by the individual situation, the essential requisites are notice and **meaningful opportunity to be heard.**" *Clayton*, 684 A.2d at 1064 (emphasis added) (citing *Soja v. Pennsylvania State Police*, 455 A.2d 613, 615 (Pa. 1982) ("the essential elements of due process are notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause")). Further, due process requires not just any hearing, but rather an **appropriate** hearing. *See Fiore v. Bd. of Fin. and Revenue*, 633 A.2d 1111, 1114 (Pa. 1993).

The United States Supreme Court in *Bell* provided the following guidance:

> The hearing required by the Due Process Clause must be "meaningful" and "appropriate to the nature of the case." It is a proposition[,] which hardly seems to need explication[,] that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet this standard.

**Bell**, 402 U.S. at 541-42 (citations omitted).

Any DUI conviction, including convictions under sections 3802(d)(1)(i) and (iii), automatically suspends the defendant's driver's license.[9]  **See** 75 Pa.C.S.A. § 3804 (pertaining to penalties).  Section 3804 provides, in relevant part, that "[t]he department **shall suspend the operating privilege of an individual** under paragraph (2) upon receiving a certified record of the individual's conviction of or an adjudication of delinquency for:  (i) **an offense**

---

[9] The Majority concludes that Smith's claim is without merit because sections 3802(d)(1)(i) and (iii) are strict liability offenses.  **See** Majority, ---DATE---, at 26 (citing **Commonwealth v. Jones**, 121 A.3d 524, 529 (Pa. Super. 2015) ("[T]he Vehicle Code precludes an individual from operating a motor vehicle with **any** amount of scheduled controlled substance, or a metabolite thereof, in the driver's blood.") (emphasis in original)).  In my view, this has little to no bearing on the outcome of Smith's irrebuttable presumption argument.  Smith argues that the irrebuttable presumption is one of impairment, not intent.  I agree and, consequently, it is of no moment whether sections 3802(d)(1)(i) and (iii) have *mens rea* requirements.  Indeed, I note that DUI—General Impairment, which Smith was acquitted of, is also a strict liability offense because it has no *mens rea* requirements.  **See** 75 Pa.C.S.A. § 3802(a)(1); **see also Commonwealth v. Segida**, 985 A.2d 871, 879 (Pa. 2009) (discussing section 3802(a)(1) elements).

**under section 3802**[.]" *Id.* at § 3804(e)(1) (pertaining to suspension of operation privileges upon conviction) (emphasis added).[10]

In my view, the instant case presents an irrebuttable presumption that Smith, a lawful medical marijuana patient under the MMA, was driving impaired and now faces an automatic and unassailable license suspension. *See Clayton*, *supra*; 75 Pa.C.S.A. § 3804(e)(1). Indeed, as the Majority notes, Smith was acquitted of DUI—General Impairment. *See* Majority, --- DATE--- at 4-5. In fact, Smith's only convictions were to sections 3802(d)(1)(i) and (iii) due to the presence of marijuana metabolites in his blood. *See id.* at 1, 5-6.

Smith had no meaningful hearing or method by which he could refute the presumption that he was impaired by the marijuana metabolites. Indeed, as I summarized *supra*, Smith presented extensive uncontested expert testimony about marijuana, its metabolites, and the effects they have on the human body. Nevertheless, in the face of sections 3802(d)(1)(i) and (iii)'s irrebuttable presumptions, that uncontroverted expert testimony was meaningless. Based upon the evidence accepted by the jury, Smith was found

_____

[10] Moreover, once an individual's driver's license has been suspended related to a DUI, any subsequent offenses are subject to the recently-questioned 75 Pa.C.S.A. § 1543(b) (pertaining to operating vehicle while license is DUI-suspended). *See Commonwealth v. Eid*, 249 A.3d 1030, 1044 (Pa. 2021) (holding section 1543(b)(1)(i) unconstitutionally vague); *Commonwealth v. Jackson*, 271 A.3d 1286, 1288 (Pa. Super. 2022) (holding section 1543(b)(1)(ii) unconstitutionally vague). Thus, police, armed with the knowledge that an individual with a valid medical marijuana prescription can no longer operate a vehicle due to metabolites in their blood, could initiate pretextual stops on this basis.

- 14 -

**not to be impaired** and yet was still **required by law** to be found guilty of DUI.

Moreover, as a direct result of those convictions, Smith's driver's license was automatically suspended under section 3804. *See* 75 Pa.C.S.A. § 3804(e)(1). Again, there was no hearing at which Smith could refute the presumption in an attempt to retain his license. In essence, the Majority's holding today makes it impossible for lawful prescription medical marijuana patients to drive without violating the DUI law and, consequently, having their properly obtained driver's license suspended. As I detailed *supra*, the expert testimony in this case reveals that marijuana metabolites can remain in an individual's bloodstream **for months after use**. *See also Williamson*, 962 A.2d at 1205. There is no method, under the current statutory scheme, for lawful medical marijuana patients to operate a vehicle, as they are licensed to do, without losing that very license. *See Clayton*, 684 A.2d at 1065 ("Clearly, precluding unsafe drivers, even those who are potentially unsafe drivers, from driving on our highways is an important interest. **But, it is not an interest which outweighs a person's interest in retaining his or her license so as to justify the recall of that license without first affording the licensee the process to which he is due**.") (emphasis added). Therefore, under our Supreme Court's holding in *Clayton*, I would conclude that sections 3802(d)(1)(i) and (iii) create irrebuttable presumptions and would find both sections unconstitutional.

In summary, under the backdrop of the foregoing caselaw and the fact that the MMA has legalized prescription medical marijuana for at least some individuals, I cannot conclude that sections 3802(d)(1)(i) and (iii) are constitutional. First, sections 3802(d)(1)(i) and (iii) violate the constitutional rights to equal protection where prescription medical marijuana patients are not afforded the same protections as prescription Marinol patients. Second, sections 3802(d)(1)(i) and (iii) create unconstitutional irrebuttable presumptions due to a lawful prescription medical marijuana patient's complete inability to challenge the presumption of impairment and/or participate in a meaningful hearing to retain their driver's license.

Accordingly, I would find sections 3802(d)(1)(i) and (iii) unconstitutional, reverse and vacate Smith's convictions, and discharge him.